AO 91 (REV.5/85) Criminal Complaint

AUSA Abra C. Siegel (312) 353-4129

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

**FILED**

v.

JOEL CASTANEDA
AUREO ALMAZAN
DAVID DIAZ

JAN 0 9 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
JAN 1 0 2002

MAGISTRATE JUDGE BOBRICK

**CRIMINAL COMPLAINT**

CASE NUMBER:

02CR0035

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  On or about January 8, 2002 in Cook County, in the Northern District of Illinois defendants

conspired to possess with intent to distribute a controlled substance, namely, in excess of 500 grams of mixtures containing cocaine, which is a Schedule II narcotic controlled substance; and

possessed a firearm during and in relation to a drug trafficking crime,

in violation of Title 21 United States Code, Section 846, and Title 18 United States Code, Section 924(c).

I further state that I am a Federal Bureau of Investigation Special Agent and that this complaint is based on the following facts:

### See attached affidavit

Continued on the attached sheet and made a part hereof:  __X__ Yes  ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

January 9, 2002
Date

at  Chicago, Illinois
City and State

Edward A. Bobrick, MAGISTRATE JUDGE
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

STATE OF ILLINOIS  )
                     )   *SS*
COUNTY OF COOK   )

## A F F I D A V I T

I, Frank L. DePodesta, Special Agent (SA) of the Federal Bureau of Investigation (FBI), United States Department of Justice, Chicago, Illinois, being duly sworn of oath, depose and states as follows:

1. I am an investigative and law enforcement officer of the United States, who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21 of the United States Code.

2. I am a Special Agent of the FBI and have been so employed for over six years. I am currently assigned to a Drug Squad of the FBI Office in Chicago, Illinois.

3. I have received special training in the investigation of narcotics trafficking and enforcement of laws concerning controlled substances as found in Title 21 of the United States Code.

4. The following information is based upon my own personal observations, knowledge, and information that I received from other law enforcement officers.

5. This affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a complaint charging David Diaz, Joel Castaneda, and Aureo Almazan with a violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 924(c), and therefore does not contain all of the

information known to me concerning this investigation.

6.    On or about December 12, 2001, the CW told the FBI that
he knew an individual named "Joe," later identified as
Joel Castaneda ("Castaneda"), who sells multiple kilogram
quantities of cocaine. The CW said that Castaneda is
normally supplied cocaine by an individual named "David,"
later identified as David Diaz ("Diaz"). The CW further
said that he had been with "David" inside an older style
green Mercury Cougar that "David" drives, and saw "David"
access a secret compartment located in the rear seat.

7.    Also on or about December 12, 2001, the CW had
consensually recorded telephone conversations with
Castaneda, about Castaneda selling kilograms of cocaine
to the CW. Castaneda told the CW in the first telephone
call that "David" was selling kilograms of cocaine for
$22,000 a piece, but that Castaneda's cousin was selling
cocaine for $21,000 or $20,500. Castaneda said he would
check the price and call the CW back. In the second
telephone call, Castaneda told the CW that his cousin did
have kilograms of cocaine available for sale for $21,000
a piece.

8.    On or about December 14, 2001, Castaneda met the CW on
Diversey Street, in Chicago. Law enforcement officers
searched the CW for narcotics before the meeting, with
negative results. The CW wore wearing a concealed
recording device and a transmitter during this meeting.

2

The meeting was also visually surveilled by law enforcement officers, who further listened to the transmitter as the meeting took place. During this meeting, Castaneda sold the CW an ounce of cocaine for $700 as a "sample" of the seven (7) kilograms of cocaine that would later be sold to the CW. Castaneda told the CW during this meeting that the seven (7) kilograms would likely come from "David."

9. On or about December 14, 2001, this sample was weighed and field tested, yielding an approximate weight of 60 grams, and a positive indication for the presence of cocaine.

11. On or about December 17, 2001, the CW met with Castaneda and Diaz at the parking lot of Mega Mall, 2500 North Milwaukee Avenue, Chicago, Illinois ("Mega Mall"). This meeting was audio recorded and surveilled by law enforcement officers. At this meeting, Castaneda and Diaz agreed to sell the CW seven ("7") kilograms of cocaine at a later date.

12. On or about January 7, 2002, the CW met with Castaneda at the Mega Mall and further discussed the purchase of seven (7) kilograms of cocaine. During this meeting, which was audio recorded, Castaneda told the CW that he and "David" would sell the CW seven (7) kilograms of cocaine for $21,250 apiece. He further explained that they wanted to first sell the CW three (3) kilograms and then sell four

3

(4) kilograms instead of all seven (7) at one time. They agreed to meet the following day.

13. On January 8, 2002, the CW spoke with Castaneda over the telephone. In this telephone call, Castaneda told the CW to meet him and Diaz at approximately 11:00 a.m. at the Mega Mall to conduct the transaction.

14. On this same day, at roughly 11:15 a.m., the CW met with Castaneda at the parking lot of the Mega Mall. For portions of this meeting, another man, later identified as Aureo Almazan ("Almazan"), was also present. At one point during the meeting, Castaneda told the CW that Diaz already had one (1) kilogram and was currently picking up another kilogram for a total of two (2). Castaneda further explained that two kilograms is currently all they have. The CW, Castaneda and Almazan waited for Diaz to arrive.

15. While at the Mega Mall, Castaneda told the CW that Almazan was acting as security. The CW observed that Almazan had a gun in his hand which he put inside his jacket. The CW walked away and telephoned an FBI agent in the area and told him that Almazan had a gun and that he believed Almazan was there to act as protection.

16. At approximately 1:15 p.m., law enforcement officers observed Diaz arrive at the Mega Mall driving a green 1993 Mercury Cougar.

17. Diaz met with the CW and showed the CW one (1) kilogram

4

of what the CW believed was cocaine which Diaz retrieved from the hidden compartment behind the rear seat of the vehicle Diaz was driving. The CW and Diaz subsequently left the green Cougar and walked towards the CW's vehicle which was also in the parking lot.

18. A short time later, law enforcement officers approached and arrested Castaneda, Almazan and Diaz as they stood in the parking lot of the Mega Mall.

19. Two loaded guns were found on Almazan's person by law enforcement officers: one was a Smith & Wesson, and the other was a FEG brand gun.

20. Keys and a key "fob" belonging to the 1993 Mercury Cougar were found on Diaz' person by law enforcement officers. Diaz told the law enforcement officers that he did not know who the 1993 Mercury Cougar belonged to and denied ownership.

21. Law enforcement officers searched the 1993 Mercury Cougar and found two (2) brick shaped packages consistent with the packaging of kilograms of cocaine.

22. Law enforcement officers weighed and field tested these brick shaped packages, which were found to have an approximate gross weight of 2,318 grams, and a positive indication for the presence of cocaine.

23. Castaneda was advised of his constitutional rights by FBI agents. Castaneda agreed to waive his rights and signed the written waiver form.

5

24. After signing the written waiver form, Castaneda told the FBI agents that a couple weeks prior he sold the CW one (1) ounce of cocaine. He also told the FBI agents that on January 8, 2002 he agreed to sell the CW seven (7) kilograms of cocaine. He called Diaz on the telephone and was told by Diaz that they could only provide two (2) kilograms of cocaine. Diaz agreed to bring the two (2) kilograms of cocaine to Castaneda and the CW. Castaneda told the FBI agents that he told Almazan that he was going to conduct a two (2) kilogram transaction and asked Almazan to act as protection because he did not trust the CW. Castaneda and Diaz each provided Almazan with a handgun.

25. Almazan was also advised of his constitutional rights by FBI agents. Almazan agreed to waive his rights and signed the written waiver form.

26. Almazan told the FBI agents that he knows both Castaneda and Diaz and knows that they sell illegal narcotics. He was aware that Castaneda was waiting for Diaz and assumed it was for an illegal narcotics transaction. He agreed to hold handguns provided to him by both Castaneda and Diaz. When he was in possession of these handguns, he was approached by the agents and officers.

6

27. Based on the foregoing, and on my training, experience, and the training and experience of other Federal law enforcement officers with whom I have spoken, I believe that there exists probable cause to believe that Castaneda, Almazan, and Diaz have violated Title 21, United States Code, Section 846, and Title 18, United States Code, Section 924(c).

FURTHER, the affiant sayeth not.

Special Agent Frank L. DePodesta
Federal Bureau of Investigation

Subscribed and sworn before me
his 9th day of January, 2002

EDWARD A. BOBRICK
United States Magistrate Judge

7