UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA       )
                               )    No.  02 CR 35-3
            v.                 )    Judge Joan Humphrey Lefkow
                               )
DAVID DIAZ                      )

### NOTICE OF FILING

FILED

*. AUG 27 2003

To:   Thomas A. Durkin
      Attorney at Law
      Suite 615
      53 West Jackson Boulevard
      Chicago, Illinois 60607
      FAX: 312/922-2055

    Please take notice that on the 27th day of August, 2003, I
caused to be filed with the clerk of the United States District
Court for the Northern District of Illinois, the following document:

GOVERNMENT'S EVIDENTIARY PROFFER
AS TO CO-CONSPIRATORS' STATEMENTS

a copy of which is attached hereto and thereby made a part hereof.

                              JOHN H. NEWMAN
                              Assistant United States Attorney
                              219 S. Dearborn, Rm. 500
                              Chicago, Illinois   60604
                              (312) 353-5323

STATE OF ILLINOIS     )
                      )    SS
COUNTY OF COOK        )

John H. Newman           , being first duly sworn, on oath deposes
and says that he is employed in the Office of the United States
Attorney for the Northern District of Illinois; that on the 27th day
of August, 2003, he caused to be hand delivered and faxed the
foregoing notice and submission, addressed to the person identified
above, at the above identified office, on said date at the hour of
about 4:00 p.m.

                              _____
                              SUBSCRIBED and SWORN to before me

                              this 27th day of August 2003

"OFFICIAL SEAL"               _____
Carol L. Blue                 N O T A R Y   P U B L I C
Notary Public, State of Illinois
My Commission Exp. 06/24/2006

69

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA            )
                                    )
              v.                    )        No. 02 CR 35-3
                                    )        Judge Joan Humphrey Lefkow
DAVID DIAZ                          )

### GOVERNMENT'S EVIDENTIARY PROFFER
### AS TO CO-CONSPIRATORS' STATEMENTS

The United States of America, by and through Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, respectfully submits this preliminary, written proffer of evidence supporting the admission of co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E) and United States v. Santiago, 582 F.2d 1128 (7th Cir. 1987), at the bench trial of defendant David Diaz ("Diaz").

### INTRODUCTION

1.    Defendant Diaz was indicted along with his co-defendants Joel Casteneda ("Casteneda") and Aureo Almazan ("Almazan") for conspiring, between December 12, 2001 and January 8, 2002, to knowingly and intentionally possess with intent to distribute and to distribute cocaine in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2 (Count One); knowingly and intentionally possessing with the intent to distribute approximately two kilograms of cocaine in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2 (Count Two); and having carried firearms during and relation to a drug trafficking crime, that is

a violation of Title 21, United States Code, Sections 841(a)(1) and 846, in violation of Title 18, United States Code, Sections 2 and 924(c).

2.    On November 8, 2002, defendant Diaz entered a plea of guilty to Counts One and Two of the indictment.  Consequently, the Court can take judicial notice that defendant Diaz has admitted under oath that he committed the drug trafficking crimes charged in Counts One and Two of the indictment.   Additionally, on May 8, 2003 and June 11, 2003 co-defendants Almazan and Casteneda each entered pleas of guilty to all three counts of the indictment.

3.    At Diaz' bench trial on Count Three, the gun count under Section 924(c), the government must prove that Diaz committed the offense "during and in relation to [a] . . . drug trafficking crime."   The government's evidence will prove that on January 8, 2002, Diaz carried and gave one gun to Almazan, and that Casteneda carried and gave a second gun to Almazan, which guns Almazan carried on his person as he provided security for Diaz and Casteneda as part of the drug conspiracy and the anticipated distribution of the two kilograms of cocaine to a Cooperating Witness ("CW") on January 8, 2002.  Moreover, under the conspiracy laws, whether a defendant personally possesses or carries a gun is irrelevant, if it is reasonably foreseeable to the defendant that one of his co-conspirators would carry a gun during and in relation to the drug transaction. United States v. Pinkerton, 328 U.S. 640

(1946); <u>United States v. Woodruff</u>, 131 F.3d 1238, 1243 (7th Cir. 1997); <u>Lee v. United States</u>, 113 F.3d 73, 76 (7th Cir. 1997); <u>Broadway v. United States</u>, 104 F.3d 901, 903-904; <u>United States v. Williams</u>, 81 F.3d 1434 (7th Cir. 1996); <u>United States v. Henderson</u>, 58 F.3d 1145 (7th Cir. 1995); <u>United States v. Edwards</u>, 36 F.3d 639, 644 (7th Cir. 1994); <u>United States v. Guiterrez</u>, 978 F.2d 1463, 1467-1468 (7th Cir. 1992); <u>United States v. Pazos</u>, 993 F.2d 136, 141 (7th Cir. 1993); <u>United States v. Allen</u>, 930 F.2d 1270, 1275 (7th Cir. 1991); <u>United States v. Diaz</u>, 864 f.2d 544, 549 (7th Cir. 1998). The government's evidence will prove that defendant Diaz (1) actually carried a gun during and in relation to a drug trafficking crime which he gave to co-defendant Almazan, and (2) it was reasonably foreseeable to Diaz that guns would be carried by his co-conspirators during and in relation to the anticipated delivery of the drugs as part of the drug conspiracy.

I.   **Governing Law On Co-Conspirator Statements**

4.   Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Admission of such a co-conspirator statement against a defendant is proper where the government establishes, by a preponderance of the evidence: (1) that a conspiracy or joint venture existed; (2) that the defendant and the person making the relevant statement were members

3

of that particular conspiracy or joint venture; and (3) that the statement was made during the course of and in furtherance of the conspiracy or joint venture. See Bourjaily v. United States, 483 U.S. 171, 175 (1987); United States v. Kelley, 864 F.2d 569, 573 (7th Cir.), cert. denied, 110 U.S. 55 (1989) ("Rule 801(d)(2)(E) applies not only to conspiracies but also to joint ventures, and ... a charge of criminal conspiracy is not required to invoke the evidentiary rule.").

5.  In this Circuit, the preferred way for the government to make its preliminary factual showing with respect to co-conspirator statements is by the filing of a pretrial written proffer of the government's evidence. See United States v. Boucher, 796 F.2d 972, 974 (7th Cir. 1986); see also United States v. Hooks, 848 F.2d 785, 794-95 (7th Cir. 1988).

### Membership In and Existence of the Conspiracy

6.  It has always been clear that an offered co-conspirator statement must itself be considered by a court in determining whether the statement was made "in furtherance" of the charged conspiracy. United States v. de Ortiz, 907 F.2d 629, 631-35 (7th Cir. 1990) (en banc); United States v. Shoffner, 826 F.2d 619, 628 (7th Cir.), cert. denied, 484 U.S. 958 (1987); United States v. Xheka, 704 F.2d 974, 986 (7th Cir.), cert. denied, 464 U.S. 993 (1983). In addition, the Supreme Court has made clear that a trial court may also consider a proffered co-conspirator statement itself

4

in determining the existence of a conspiracy and a defendant's participation in it. <u>Bourjaily</u>, 483 U.S. at 180-81; <u>United States v. Zambrana</u>, 841 F.2d 1320, 1344-45 (7th Cir. 1988) (discussing how overall context of co-conspirator statements is what makes the statements very reliable as to a defendant's role in a conspiracy).

### The "In furtherance of" Requirement

7.      Where Rule 801(d)(2)(E) is implicated, it is clear that "statements made during the course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible against those who arrive to join a going concern." <u>Potts</u>, 840 F.2d at 372 (citing cases). Moreover, "[c]onversations made by co-conspirators to prospective co-conspirators for membership purposes are acts in furtherance of the conspiracy." <u>Shoffner</u>, 826 F.2d at 628 (quoting and citing cases). Similarly, a conspirator who has become less active in the conspiracy nevertheless is liable for his conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. <u>United States v. Feldman</u>, 825 F.2d 124, 129 (7th Cir. 1987); <u>accord</u> <u>United States v. Andrus</u>, 775 F.2d 825, 850 (7th Cir. 1985).

8.      In determining whether a statement was made "in furtherance" of the conspiracy, courts look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. <u>Shoffner</u>, 826 F.2d at 628; <u>United States v. Mackey</u>, 571 F.2d 376, 383 (7th Cir. 1978). Under the reasonable basis standard, a

5

statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy; the statement need not have been exclusively, or even primarily, made to further the conspiracy in order to be admissible under the co-conspirator exception. Shoffner, 826 F.2d at 628.

9. The Seventh Circuit has upheld the admission of a wide variety of co-conspirator statements. Not only "recruiting" statements, id., but also updates on a conspiracy's progress, Potts, 840 F.2d at 371; and conversations concerning planning or review of co-conspirators' exploits, United States v. Molt, 772 F.2d 366, 368-69 (7th Cir. 1985), cert. denied, 475 U.S. 1081 (1986), have been approved as "in furtherance" of conspiracies.

10. In general, statements that are "part of the information flow between conspirators intended to help each perform his role" are statements "in furtherance." Van Daal Wyck, 840 F.2d at 499. Similarly, assurances that a co-conspirator can be trusted or relied upon to perform his role are considered to further the conspiracy. See United States v. Buishas, 791 F.2d 1310, 1315 (7th Cir. 1986). And statements designed to conceal a conspiracy also are deemed to be "in furtherance" of it where ongoing concealment is one of its purposes. See Mackey, 571 F.2d at 383; see also United States v. Kaden, 819 F.2d 813, 820 (7th Cir. 1987). Finally, it is immaterial that statements otherwise "in furtherance" were made to a government witness, informer, or agent.

6

United States v. Mealy, 851 F.2d 890, 901 (7th Cir. 1988).

11.    "It is universally held that the fact that one party to a conversation is a government agent or informer does not of itself preclude the admission of the other party--if he or she is a member of a conspiracy--under Rule 801(d)(2)(E)."    United States v. Robinson, 956 F.2d 1388, 1394 (7th Cir. 1992).  Nor does the arrest of one co-conspirator, who then decides to cooperate with the government and make recorded conversations with other co-conspirators, automatically terminate the conspiracy.    United States v. Haddad, 976 F.2d 1088, 1093 (7th Cir. 1992).    If the other co-conspirators continue to carry on the object and goals of the conspiracy, their statements to the cooperating defendants are statements in furtherance of the conspiracy.  Mealy, 851 F.2d at 901.

### Alternative Bases for Admission of Statements

12.    Admissions by a defendant are admissible against him pursuant to Rule 801(d)(2)(A), without reference to the co-conspirator statement rule.    See United States v. Shoffner, 826 F.2d at 626-27 and n.10.[1]    In addition, a defendant's own statements are obviously and powerfully relevant to establishing the factual predicates for the admission of co-conspirator

---

[1] Similarly, other sections of Rule 801(d)(2) provide independently for the admission of "adopted" statements, "authorized party" statements, and statements made by an agent within the context of an existing agency relationship. See, e.g., United States v. Feldman, 825 F.2d 124, 127 (7th Cir. 1987).

statements against him.  See <u>United States v. Potts</u>, 840 F.2d 368, 371-72 (7th Cir. 1987).

13.  The co-conspirator statement rule also is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification; an example would be a declaration that is simply an order or suggestion.  See <u>United States v. Tuchow</u>, 768 F.2d 855, 868 n.18 (7th Cir. 1985).  More importantly, the co-conspirator statement rule is not implicated if a statement is not offered in evidence to prove the truth of the matter asserted and thus does not constitute "hearsay" as defined by Rule 801(c).  Accordingly, statements by alleged co-conspirators may be admitted against a defendant, without establishing the <u>Bourjaily</u> factual predicates but with corresponding limiting instructions, where such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. <u>United States v. Herrera-Medina</u>, 853 F.2d 564, 565-66 (7th Cir. 1988); <u>United States v. Van Daal Wyck</u>, 840 F.2d 494, 497-98 (7th Cir. 1988); <u>Tuchow</u>, 768 F.2d at 867-69; <u>United States v. Magnus</u>, 743 F.2d 517, 521-23 (7th Cir. 1984).  Of course, in many cases, extended statements by co-conspirators will include both declarations offered for the truth of the matters asserted and declarations offered for other purposes.  See <u>Tuchow</u>, 768 F.2d at 868-69 & n.17.

8

## II.  ANALYSIS OF THE EVIDENCE

14.  Outlined below is a chronological summary of the evidence that establishes the existence of the charged drug conspiracy, the participation of defendants Diaz, Casteneda, Almazan and others in the conspiracy, and identifies statements made in furtherance of the conspiracy that are admissible against defendant Diaz.

15.  Based on recorded conversations and surveillance reports (given to defense counsel), information furnished by the CW, admissions made by defendant Diaz and his co-conspirators, and the anticipated testimony of co-defendants Casteneda and Almazan and others who will testify for the government at trial, the government's evidence at trial will prove the following:

A.  During the period from approximately December 12, 2001 to January 8, 2002, defendant Diaz, along with co-defendants Casteneda and Almazan and others, engaged in a conspiracy to distribute seven kilograms of cocaine to the CW. However, by January 8, 2002, it was decided by Diaz and Casteneda to first sell two kilograms of cocaine to the CW. On January 8, 2002, as part of the conspiracy, co-defendant Almazan was provided with two guns: one from Diaz and one from Casteneda, to provide security for them during their drug deal with the CW.

B.  Specifically, on December 12, 2001 Casteneda told the CW, who was looking to buy seven kilograms of cocaine, that the price would be approximately $21,000 per kilogram if purchased from

9

Casteneda's cousin, because Diaz' price was "too expensive." Later the same day, Casteneda told the CW that he called "David" [Diaz] and that his price was the "same" as Casteneda's cousin, but that the cocaine would be sold "one by one [one kilogram at a time]." Casteneda said that "people . . . we have [are] very cautious" and "we have like four guys with us" who park nearby the drug transaction and they "we pay give them two hundred bucks each." Casteneda said that "nobody goes in just me, David and whoever." The CW requested "a sample" to show his purported drug buyers and Casteneda said "okay" and it would cost "seven" [$700].

C.  On December 14, 2001 the CW met with Casteneda, obtained the sample of cocaine, and paid Casteneda $700.  Casteneda said everyone was "cooking it" [referring to crack cocaine].  Casteneda told the CW that things were not good because a Puerto Rican guy robbed him, and therefore Casteneda had invested $400 "buying a nine millimeter" gun and was looking for the Puerto Rican. Casteneda said "we have six" guns.  Casteneda explained that in a drug transaction he would have people "right here", "over there" and "in the back" for security "in case they try to like rob us" and "start busting caps" [shooting].  Casteneda said "he's gonna leave it cheaper . . . at twenty-one" [$21,000 per kilogram]. Casteneda and CW discussed how the drug transaction would take place, with the CW first showing the money to Casteneda, before the delivery of the drugs to the CW.  Casteneda asked if the CW's

10

people would take "one and one" [one at a time], because Casteneda was involved in a previous drug transaction in a vehicle where the buyers "put a [expletive] pistol to my head", but Casteneda "opened the door on them and I took off." Casteneda said that "if I'm gonna die from a bullet, I'd rather die getting run over." Casteneda said "that's why, man . . . all my bros are, man, you got to be careful . . . . Now they all help me out." Casteneda said the "seven keys that you want, I'm going to get." It was agreed that they would talk to David [Diaz] about the plan to sell cocaine.

D.     On December 17, 2001 the CW met with Casteneda and Diaz. Diaz said he could not deliver all seven kilograms "in one load." Diaz said he "can't go inside with them", but that he would "show them" to the CW and if there was a problem with any of the kilograms "I'll exchange them." Casteneda said the kilograms are the same as the sample sold to the CW and Diaz said "those are guaranteed." Diaz and Casteneda told the CW they would sell cocaine to the CW for "twenty-one" [$21,000] per kilogram, and Casteneda said they could sell the CW "seven" [kilograms of cocaine]. Diaz, Casteneda and the CW discussed how the drug transaction would take place. The CW explained that there would be three people on his side bringing the money and taking the cocaine. Diaz said "the only thing I don't like is why so many in one load." The CW responded that it was because the load was going to

11

Wisconsin and Diaz said "okay, then go for it." In a later telephone conversation, Diaz told the CW that "tomorrow morning should work" and handed the phone to Casteneda to decide when and where to meet.

E.     On December 18, 2001 the CW met with Diaz and Casteneda and Diaz asked "how you wanna do this." Casteneda explained that they wanted to sell the CW "two at a time" rather than all seven kilograms at once. Diaz said "you get the money. You come half way. Just by yourself. I give the merchandise. You give me the money and you take it to them. But there's nothing about that bringing this guys here and this and that" referring to the people associated with the CW. Diaz said "I don't trust nobody like that". Casteneda said "its too much" and that he would "kill myself before anybody . . . tries anything like that ever again." Diaz said "Its not that I kill myself. Its that we gonna kill each other. You know what I mean? I'm not gonna let no [expletive] this time to take nothing. This time I prepared." Diaz said "why don't we do two, two, two" [kilograms at a time]. Regarding mutual trust, Casteneda told the CW that "its not about you." Diaz told the CW "you and him are going to be trading . . . no one is going to get close to that place . . . give him the money. He's going to give you the bricks right away." Casteneda said their supplier is "not playing any games. He's not gonna be giving us a good one, a bad one, a good one, a bad one. No. No. They all got to be the

same." Castaneda said "we should just do it right here" [at the Mega Mall]. The CW said that "what I can do is open the trunk . . . [to] see the money", and Castaneda said "yeah." Diaz said in regard to their supplier "I'm gonna call right now . . . I'll call Joe [Castaneda]." And then Joe will tell you what's up."

F.    On January 7, 2002 the CW met with Castaneda who told the CW "he said as many as you want. But it has to be like two or three at a time." Castaneda said he liked his Bravada because "I can hide my [expletive] pistol".

G. On January 8, 2002, as agreed earlier, the CW planned to meet Diaz and Castaneda at the Mega Mall in Chicago to complete the cocaine drug transaction previously discussed. After arriving in the Mega Mall parking lot, the CW got into Castaneda's Bravada, where Castaneda showed the CW a nine millimeter handgun. Thereafter, as agreed, an undercover [UC] car pulled up, the trunk was popped open, and the CW showed Castaneda approximately $147,000 to be used to purchase seven kilograms of cocaine. Castaneda then made a call and said "I already saw them," and told the CW that Diaz would be there shortly. Castaneda said "they're only bringing two". Castaneda made several calls to learn of Diaz location and when he would be at the Mega Mall. Before Diaz arrived with the two kilograms of cocaine in his car, the CW observed co-defendant Almazan with a gun. Almazan will testify that before Diaz arrived with the two kilograms of cocaine, he was given a handgun (a nine

millimeter Smith and Wesson) by Casteneda, to provide security for Casteneda and Diaz during their planned drug transaction with the CW, and for which Almazan was to be paid. Later, Diaz arrived alone at the Mega Mall parking lot driving a green Cougar. Almazan then met with Diaz at which time he gave Almazan a second handgun (a nine millimeter FEG) to provide security for Diaz and Casteneda during their drug transaction with the CW. Thereafter, the CW got into Diaz' car and was shown a kilogram of cocaine. A second kilogram of cocaine was later found in a concealed trap compartment in the back seat area of the vehicle being driven by Diaz. Diaz said "they are the same ones. There's no problem. They are 100 percent guaranteed." Shortly thereafter Diaz, Casteneda and Almazan were arrested. Almazan had two loaded handguns on him which he told the agents he received from Diaz and Casteneda, as part of their drug deal with the CW. Casteneda told the agents that earlier he contacted Almazan and told him to hold his gun and to stay in the area as protection. Defendant Diaz falsely claimed in his post arrest statement that friends had dropped him off at the front entrance of the Mega Mall and he was there to meet some friends. This false statement is offered against Diaz to show the prior existence of the conspiracy.

16. The post arrest statements by Casteneda and Almazan are also offered to prove the prior existence of the conspiracy. Specifically, acts and conduct of the conspirator, not consisting

of hearsay declarations, are admissible to prove the prior existence of the conspiracy even though occurring after the termination of the conspiracy. Anderson v. United States, 417 U.S. 211 (1974) (perjurious sworn testimony of two conspirators subsequent to termination of the conspiracy introduced against all defendants to show prior existence of the conspiracy); Lutwak v. United States, 344 U.S. 604, 617-618 (1953).

Therefore, the evidence summarized above establishes (1) that during the period from approximately December 12, 2001 to January 8, 2002, a conspiracy existed to possess with intent to distribute and to distribute cocaine, as charged in Count One of the indictment; (2) that defendant Diaz was a member of that conspiracy; and (3) that on January 8, 2002, co-defendant Almazan joined that conspiracy and took steps to try and make it succeed.

## III. CONCLUSION

For the reasons set forth above, the government respectfully requests that the statements outlined above and other similar statements be admitted as co-conspirator statements under Rule 801 (d) (2) (E), or alternatively, as other exceptions to the hearsay rule, as outlined above.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: _____
JOHN H. NEWMAN
Assistant United States Attorney

15